UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒-

MICHAEL REID a.k.a. WAYNE MARTIN,

                Plaintiff,

      - against -

THE CITY OF NEW YORK, DETECTIVE KEVIN
GASSER (Tax ID 904007), DETECTIVE
BRAITHWAITE (Tax ID 880686), DETECTIVE
MIKE HOPKINS (Tax ID 911083), OFFICER
WALTER CONNOLLY (Shield #1217), MARC
FLIEDNER, JOHN DOES 1-5 (the name "John
Doe" being fictitious as the true name is presently
unknown) individually and in their official capacity
as employees of the City of New York,

                Defendants.

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒-

DOCKET NO:  17-cv-05268

**COMPLAINT
AND JURY DEMAND**

Plaintiff MICHAEL REID a.k.a. WAYNE MARTIN, by and through his attorneys, NAPOLI

SHKOLNIK, PLLC, complaining of the defendants states as follows:

**PRELIMINARY STATEMENT**

1.  This is a civil rights action for the malicious prosecution and wrongful conviction of Plaintiff

MICHAEL REID a.k.a. WAYNE MARTIN (hereinafter "Mr. Martin") in which Plaintiff

seeks relief for Defendants' violation of his rights secured by the Civil Rights Act of 1871,

42 U.S.C. §1983 and 42 U.S.C. §1988, and of rights secured by the First, Fourth and

Fourteenth Amendments to the United States Constitution, and of rights secured under the

laws and Constitution of the State of New York.  Plaintiff seeks damages, compensatory and

punitive, affirmative and equitable relief, an award of costs, interest and attorney's fees, and

such other and further relief as this Court deems equitable and just for his nearly nine (9)

years of wrongful incarceration.

2. On August 20, 2008, an indictment was filed charging Mr. Martin with: one count of murder in the first degree, P.L. 125.27, a class A felony; two counts of murder in the second degree, P.L. 125.25, a class A felony; one count of attempted murder in the second degree, P.L. 110/125.25, a class B felony; one count of assault in the first degree, P.L. 120.10, a class B felony; one count of criminal possession of a weapon in the second degree, P.L. 265.03, a class C felony; and, one count of criminal possession of a weapon in the third degree, P.L. 265.02, a class D felony. A copy of the indictment is attached hereto as **Exhibit 1.**

3. On September 8, 2010 following a jury trial before the Hon. Alan Marrus, Mr. Martin was convicted on counts of murder and assault in the first degree and sentenced to life imprisonment without the possibility of parole.  He commenced service of his sentence immediately.

4. The judgment of conviction was rendered after a jury trial pursuant to indictment number 4590/08 in the Supreme Court of the State of New York, County of Kings.

5. In response to a *Pro-Se Habeas Corpus* petition filed by Mr. Martin, an Assistant District Attorney in the Appeals Bureau at the Kings County District Attorney's Office, discovered with the case folder, an "irregular copy" of the Homicide Investigation Report.  This copy was found in a file marked "Discovery", and was irregular in that a passage recounting an identification procedure by Mr. Walker of an individual other than Mr. Martin was completely redacted.  Subsequently, in March, 2016, the case was assigned to the Kings County Conviction Review Unit to determine whether the redacted *Brady* information had been disclosed to the defendant at trial.

6. Subsequently, in a letter of June 17, 2016, the Office of the District Attorney revealed that significant exculpatory evidence had been withheld from Mr. Martin's trial counsel, in

violation of the obligations of that office pursuant to § 3.8(g) of the Model Rules of Professional Conduct, CPL 240.20(1)(h), *Brady v. Maryland*, 373 U.S. 83 (1963) and the New York State and United States Constitutions. A copy of this letter is attached hereto as **Exhibit 2**. Thereafter, on July 7, 2016, this Court vacated Mr. Martin's convictions in the instant matter, but not the indictment.

7. A further hearing was held on September 7, 2016 in response to the District Attorney's letter and in response to a CPL §210 motion filed by Mr. Martin through his attorneys.  See annexed transcript of hearing at **Exhibit 2.5**.  On September 7, 2016, at the urging of the Kings County District Attorney's office, the indictment against Mr. Martin was dismissed. District Attorney Ken Thompson issued the following statement:

*"Following a thorough re-examination of this case, I have concluded that a lack of reliable evidence, compounded by the utter failure to disclose exculpatory evidence at the original trial, would make it impossible to retry this case."*

8. Pursuant to the dismissal, claimant's status as a convicted murderer was vitiated in the State of New York.

9. Claimant, as a result of the intentional and calculated violations of his constitutional rights by Detective Kevin Gasser, Police Officer Walter Connolly, Detective Mike Hopkins, Detective Braithwaite, Assistant District Attorney Marc Fliedner and the Kings County District Attorney's Office, as well as a lack of any credible evidence, by that time, had continuously served over eight years in jail and maximum security state prison facilities for a crime he did not commit.

10. Mr. Martin consistently maintained his innocence, and was vindicated in 2016, in response to a motion submitted by him and his attorney, and joined by the Kings County District Attorney.  His conviction was vacated and the indictment was dismissed by a State Supreme

Court judge.  See Transcript at **Exhibit 2.5**.

11. Mr. Martin did not commit any of the acts as charged in the indictment.  In fact, Mr. Martin has maintained his innocence throughout without any statements, admissions, or a confession ever having been attributed to him.

12. Furthermore, Mr. Martin has in no way brought about his own conviction, as he was a man who was targeted and framed by police officers and detectives in concert with the Assistant District Attorney for a crime he did not commit.

13. The following exhibits are attached hereto as part of this Complaint:

    1.     Copy of the Indictment;

    1.1    Copy of Jury note and Verdict Sheet with pages of transcript related to the verdict;

    1.2    Transcript of Sentencing – Life Without Parole;

    2.     Letter from District Attorney's office to Judge D'Emic revealing exculpatory evidence that had not been disclosed prior to trial;

    2.1    Copy of Transcript from Dismissal Hearing before Honorable Matthew D'Emic held on 9-7-16;

    2.2    Copy of Certificate of Disposition for Indictment #4590/08;

    3.     Complaint Follow-Up Informational Report re:  "Crime Scene Unit Response" completed by Detective Braithwaite of the 67th Precinct, dated 11-27-05;

    4.     Photographs of the scene of Gary's Tire Emporium taken by CSU on 11-25-05;

    5.     Laboratory Report prepared by the Office of the Chief Medical Examiner regarding Complaint Number 2005-067-13298, dated 3-23-06;

    6.     Complaint Follow-Up Informational Report re: "DNA Hit" completed by Detective Gasser of the 67th Precinct, dated 5-26-06;

7.      Complaint Follow-Up Informational Report re: "Interview of Donald Turner M/B 17," completed by Detective Ambrosi of the Brooklyn South Homicide Squad and dated 11-27-05;

8.      Complaint Follow-Up Informational Report re: "Attempt to interview Donald Turner (baby)," completed by Detective Kevin Gasser of the 067 Squad and dated 11-28-05;

9.      Complaint Follow-Up Informational Report re: "Interview of Donald "Baby" Turner," completed by Detective Kevin Gasser of the 067 Squad and dated 11-29-05;

10.     Complaint Follow-Up Informational Report re: "Conversation with Winsome Turner," completed by Detective Kevin Gasser of the 67th Precinct and dated 9-29-06;

11.     Complaint Follow-Up Informational Report re: "Interview of Winsome Turner (wife of Donald "Gary" Turner)," completed by Detective Kevin Gasser of the 67th Precinct and dated 11-28-05;

12.     Complaint Follow-Up Informational Report re: "Conversation with Ava Welch" completed by Detective Kevin Gasser of the 67th Precinct and dated 11-30-05;

13.     Complaint Follow-Up Informational Report re: "Conversation with Akeem Tillett," completed by Detective Kevin Gasser of the 67th Precinct and dated 12-4-05.

14.     Complaint Follow-Up Informational Report re: "Computer Checks On Kimarley A. Turner," completed by Detective Mike Hopkins of the Brooklyn South Homicide Squad and dated 12-5-05.

15.     Selected pages from Detective Kevin Gasser's Log Book beginning 11-27-05.

16.     Line-Up Report by Detective Kevin Gasser dated 2-11-08 and corresponding photographs;

17.     Report of "Four Males Shot, Two D.O.A., Two Not Likely, No Arrests Made, Within The Confines Of The 067

Precinct," from Patrol Supervisor, 067 Precinct to Chief of Patrol, dated 11-27-05;

18.     Irregular Homicide Report provided to the defense by the Kings County district Attorney's Office;

19.     Complaint Follow-Up Informational Report re: "Interview of Michael Belgrove," completed by Detective John McGurran of the 67th Precinct and dated 12-8-05.

20.     Selected pages from Detective Mike Hopkins' log book for the instant matter;

21.     Michael Brick, "Brooklyn Man is Convicted of Murder in Officer's Shooting," The New York Times (10-12-07) – "the case led the city to spend $12 million on new bullet resistant vests that would provide more coverage of the neck and the sides of the torso.  In Albany, lawmakers passed new laws increasing the penalties for weapons possession and crimes against police officers."

22.     Al Baker, "Officer is Killed After Pulling Up Next to Gunman," New York Daily News, (11-29-05) – Allan Cameron was reportedly driving "a maroon 1990 Infiniti Q-45 Sedan.";

23.     Scott Shifrel, "Thug Goes on Trial for 2005 Cop Shooting," New York Daily News, (9-16-07).

14. As a direct result of the NYPD's and Prosecutor's intentional, willful, wonton, reckless or deliberately indifferent acts and the District Attorney's eventual acknowledgment that there remained no credible evidence against Mr. Martin, he was robbed of more than eight years of his life and freedom, and sustained, and will likely continue to sustain physical, psychological and emotional damages.

## JURISDICTION AND VENUE

15. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343 and §1331, this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

16. Jurisdiction is also invoked herein pursuant to the First, Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983 and 42 U.S.C. §1988.

17. Plaintiff respectfully requests that this Court exercise supplemental jurisdiction, pursuant to 28 U.S.C. §1367, over any state court causes of action that arise from a common nucleus of operative facts that give rise to the federally based causes of action pleaded herein, and as against all parties that are so related to claims in this action within the original jurisdiction of this Court that are formed as part of the same case or controversy.

18. Plaintiff has complied with the requirements of New York General municipal Law Section 50-I.  Through his attorneys, Plaintiff served a Notice of Claim on all municipal defendants on October 5, 2016, within the time required by New York General Municipal Law §50-e. More than thirty days have elapsed since the service of those notices, and no offer of settlement has been made.

19. A municipal hearing was held on April 13, 2017 pursuant to section 50-h of the New York General Municipal Law.

20. Venue herein is proper for the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. §1391 (a), (b) and (c).

## JURY DEMAND

21. Pursuant to the Seventh Amendment of the United States Constitution and pursuant to Fed. R. Civ. P. 38(b), Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

22. Plaintiff MARTIN is, and at all times material to this Complaint was, a citizen and resident of the State of New York.  He resides in Brooklyn, New York.

23. Defendant CITY OF NEW YORK is a municipal corporation of the State of New York, was the employer of defendants GASSER, BRAITHWAITE, HOPKINS, CONNOLLY and FLIEDNER and JOHN DOES 1-5, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the NEW YORK CITY POLICE DEPARTMENT as well as the KINGS COUNTY DISTRICT ATTORNEY'S OFFICE.

24. Defendant DETECTIVE KEVIN GASSER at all times relevant to this complaint was a duly appointed and acting law enforcement officer of the New York City Police Department, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Defendant GASSER is sued in his official and individual capacity.

25. Defendant DETECTIVE BRAITHWAITE at all times relevant to this complaint was a duly appointed and acting law enforcement officer of the New York City Police Department, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Defendant BRAITHWAITE is sued in his official and individual capacity.

26. Defendant DETECTIVE MIKE HOPKINS at all times relevant to this complaint was a duly appointed and acting law enforcement officer of the New York City Police Department, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Defendant HOPKINS is sued in his official and  individual capacity.

8

27. Defendant OFFICER WALTER CONNOLLY at all times relevant to this complaint was a duly appointed and acting law enforcement officer of the New York City Police Department, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. Defendant CONNOLLY is sued in his official and individual capacity.

28. Defendant MARC FLIEDNER at all times relevant to this complaint was a duly appointed and acting Assistant District Attorney for the Kings County District Attorney's Office, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. Defendant FLIEDNER is sued in his official and individual capacity.

29. Defendants JOHN DOES 1-5 at all times relevant to this complaint were duly appointed and acting employees as either police officers and/or supervisory officers of defendant CITY OF NEW YORK, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. Defendants DOES 1-5 are sued in their official and individual capacities.

## FACTUAL BACKGROUND

30. As a direct result of the defendants' intentional, willful, wonton, reckless or deliberately indifferent acts and the Kings County District Attorney's eventual acknowledgment that there remained no credible evidence against Mr. Martin, he was robbed of more than nine years of his life and freedom, and sustained, and will likely continue to sustain physical, psychological and emotional damages.

19. On November 27, 2005, at approximately 5:10 P.M., Donald "Gary" Turner Sr., Donald "Baby" Turner Jr., and Ricardo "Bigger" Davids were shot during an attempted commercial

robbery at Gary's Tire Emporium—an automobile parts store owned by Turner Sr. and located at 262 East 96th Street in Brooklyn. Donald Turner Sr. and Ricardo Davids were killed in the shooting, while Donald Turner Jr. survived with lingering injuries.

20. Michael Walker, an eyewitness and friend of the Turners, was present for the shootings but escaped unharmed. At approximately 5:35 P.M., Walker provided a description of the shooter and his apparel to responding officers. However, both Michael Walker and Donald Turner Jr. would later make clear that two individuals appeared to have been involved.

21. Approximately 11 minutes after the shootings at Gary's Tire Emporium, police were notified of the shooting of another male at the corner of 93rd Street and Willmohr Street. The victim of this second shooting, Jeffrey Joseph, was briefly treated by EMT's at the scene before being transported to Brookdale Hospital with bullet wounds to the neck, elbow and chest. Joseph's jacket was removed by the EMT's and left at the scene. Later that evening at Brookdale Hospital, in the presence of Detective Kevin Gasser of the 67th Precinct, Joseph identified his assailant from a photographic array.

22. Jeffrey Joseph was quickly considered the prime suspect in the shootings at Gary's Tire Emporium. Only moments after making contact with Michael Walker, investigating officers transported Mr. Walker to Brookdale Hospital to participate in a "show-up" identification procedure. Less than an hour after the crime, Michael Walker positively identified Jeffrey Joseph in person at Brookdale Hospital as the individual who had done the shooting at Gary's Tire Emporium.

23. Immediately thereafter, Walker was transported to the corner of 93rd and Willmohr in order to view Jeffrey Joseph's jacket—which matched the description of the shooter's jacket provided earlier by Walker to responding officers. At that time, Michael Walker confirmed

that Joseph's jacket appeared to be the same one that had been worn by the shooter. Michael Walker's identifications of Jeffrey Joseph and, subsequently, of Joseph's jacket, were not memorialized in any DD-5 and would ultimately comprise part of the information which the Office of the District Attorney has conceded was improperly withheld from the defense at trial.

24. Detective Gasser was assigned to lead the investigation into the shootings at Gary's Tire Emporium. Gasser was apparently unable to speak at length with Donald Turner Jr. on the evening of the shootings. However, on November 29, 2005—two days after the shootings— Detective Gasser revisited Turner Jr., who provided a thoroughly detailed account of the crime in addition to a description of the perpetrator(s).

25. On December 16, 2005, Donald Turner Jr. suffered an apparent aneurysm. Turner Jr. survived, but complained of resulting memory loss. However, he would later claim to have fully recovered by September of 2006—and to have informed Detective Gasser of his recovery.

26. On December 8, 2005, Michael Belgrove was arrested in an unrelated matter. While at the 73rd Precinct, Belgrove revealed that he had been an eyewitness to the shootings at Gary's Tire Emporium on November 27, 2005. He then identified Allan Cameron—who had been arrested for the fatal shooting of Police Officer Dillon Stewart in the early morning hours of November 28, 2005—as having been the shooter at Gary's Tire Emporium.

27. Belgrove explained that shortly after he had witnessed Allan Cameron shooting at Gary's Tire Emporium, he recognized Cameron from a television report about the murder of Officer Stewart. Although his account was communicated to officers at the 67th Precinct—and although he was transported to the 67th Precinct for further questioning after being

interviewed at the 73rd Precinct—Michael Belgrove's identification of Allan Cameron was never revealed to Mr. Martin's trial counsel. Michael Belgrove's eyewitness account of the shootings at Gary's Tire Emporium on November 27, 2005—and his subsequent identification of Allan Cameron as the perpetrator—comprise the balance of the exculpatory evidence which the Office of the District Attorney has conceded was improperly withheld from the defense at trial.

28. According to Detective Gasser, a DNA test on May 26, 2006, linked Mr. Martin to evidence recovered from Gary's Tire Emporium. On February 11, 2008, Detective Gasser placed Mr. Martin in a lineup seated directly alongside Jeffrey Joseph. Gasser then brought Michael Walker—but not Donald Turner Jr. or Michael Belgrove—to view the lineup. After viewing the lineup containing both Jeffrey Joseph and Mr. Martin, Michael Walker identified Mr. Martin as having been the perpetrator of the shootings at Gary's Tire Emporium.

29. On July 17, 2008, Grand Jury proceedings commenced in the instant matter. Assistant District Attorney Marc Fliedner—who would later also represent the People at trial—presented the case to the Grand Jury. Both Detective Kevin Gasser and Michael Walker were among the witnesses to testify before the Grand Jury. Donald Turner Jr. was absent from the proceedings—although he would later be called to testify at trial. Based on the evidence presented to the Grand Jury, an indictment was returned against Mr. Martin on August 20, 2008.

## EVIDENCE OF INNOCENCE DISCOVERED

I.   **Police Officers, Detectives and the Assistant District Attorney knowingly, negligently, recklessly and deliberately manufactured and presented false and misleading evidence during the investigation and court proceedings which deceived and manipulated the Grand Jury and the Trial Jury – causing the Plaintiff's conviction and subsequent incarceration.**

30. Two items of headwear were reportedly found at Gary's Tire Emporium following the shootings on November 27, 2005. The first, a "ski-mask type hat" was initially recovered from the interior of the scene. The second, a "black knit hat," was allegedly recovered from the sidewalk directly in front of the scene hours after the shootings. Both items were vouchered under the same invoice number—M981642.[1] It is clear that the shared invoice number was utilized by Mr. Fliedner to mislead and manipulate the Grand Jury into returning a defective indictment.

31. While the presence of the "ski-mask type hat" on the shop's floor was reported by Michael Walker shortly after the shootings—which occurred at approximately 5:10 P.M.—the "black knit hat" wasn't recovered for more than four hours before canine Officer Walter Connolly supposedly first noticed it sometime after 9:15 P.M. This, despite initial responding officers—including lead investigator Detective Kevin Gasser—and the Crime Scene Unit, which arrived sometime between 7:00 P.M. and 8:00 P.M., having meticulously canvassed and documented the scene prior to Officer Connolly's discovery.

---

[1] See Exhibit 3: Complaint Follow-Up Informational Report re: "Crime Scene Unit Response" completed by Detective Braithwaite of the 67th Precinct, dated 11/27/05

32. According to Officer Connolly, he recovered the "black knit hat" from the sidewalk directly outside of Gary's Tire Emporium—between the street and the body of Ricardo Davids. However, photographs taken by the Crime Scene Unit well before Officer Connolly's arrival clearly depict the area where Connolly claimed to have found the hat—and show unquestionably that it simply wasn't present when the scene was secured hours before his alleged discovery.[2] Furthermore, the photographs make evident that the sidewalk surrounding the body of Ricardo Davids was the subject of especially scrupulous documentation.

33. According to a report by the Office of the Chief Medical Examiner dated March 23, 2006, "[h]uman DNA was found on *the ski mask* obtained from 'floor of location' and knit hat obtained from 'sidewalk f/o location.' PCR DNA typing was done; DNA profiles from two people (male A and male B) were found. These profiles [were] not the same as Ricardo Davids or Gary Turner."[3] The report states that a minimum of three people contributed to the DNA sample taken from the "ski mask" found inside the shop, including one major donor— referred to as "male A." A minimum of two people contributed to the DNA sample taken from the "knit hat" allegedly found outside by Officer Connolly, including one major donor—referred to as "male B."

34. A police report prepared by Detective Gasser on May 26, 2006, memorialized the results of the DNA test which allegedly linked Mr. Martin to "the ski mask (voucher #M981642) found inside [Gary's Tire Emporium]."[4]

---

[2] See Exhibit 4: Photographs of the scene of Gary's Tire Emporium taken by CSU on 11/25/05
[3] See Exhibit 5: Laboratory Report prepared by the Office of the Chief Medical Examiner regarding Complaint Number 2005-067-13298, dated 3/23/06 (Emphasis added).
[4] See Exhibit 6: Complaint Follow-Up Informational Report re: "DNA Hit" completed by Detective Gasser of the 67th Precinct, dated 5/26/06

35. The following exchanges between prosecutor Marc Fliedner and criminalist Christopher Kamnik during the grand jury proceedings in the instant matter are direct proof that Mr. Fliedner obtained the indictment in this case through deceiving the grand jury by substituting the "ski-mask" for the "knit hat":

**Mr. Fliedner**: "Did there come a time when your lab received evidence regarding this particular case; did you receive evidence about a shooting that was alleged to have taken place on November 27, 2005 at a location known as Gary's Tire Emporium here in Brooklyn resulting in the death of one Donald Gary Turner and one Ricardo David? [sic]"

**Mr. Kamnik**: "Yes."

**Mr. Fliedner**: "What evidence was received -- withdrawn. Did the evidence that was received include one item *referred to as a black knit hat*?"

**Mr. Kamnik**: "Yes."

**Mr. Fliedner**: "Based on your review of the documentation, what was your understanding of where the black knit hat was located?"

**Mr. Kamnik**: "According to the NYPD laboratory request sheet that I received, that was recovered *on the sidewalk front of the location*."

**Mr. Fliedner**: "That would be the location that I specified. Is it your understandings [sic] that it was *obtained by the crime scene individuals when processing the scene*?"

**Mr. Kamnik**: "Yes."

**Mr. Fliedner**: "Was that *particular item* secured under voucher number M981642?"

**Mr. Kamnik**: "Yes."[5]

 …

**Mr. Fliedner**: "Now, was there, in fact, testing performed on *the black knit cap*?"

**Mr. Kamnik**: "Yes."[6]

 …

**Mr. Fliedner**: "Were you able to make any determinations about that, did you make any DNA findings?"

**Mr. Kamnik**: "DNA profile that I spoke to you about before the major DNA profile with *the knit hat is a match as the DNA profile as Wayne Martin* [sic]."

**Mr. Fliedner**: "You were able to develop a DNA profile as you were with the knit hat you made a comparison?"

**Mr. Kamnik**: "Yes."

**Mr. Fliedner**: "When you say it is a match what do you mean by that?"

**Mr. Kamnik**: "They are the same DNA profiles. I would say the DNA - - the major DNA profile found in *the knit hat* is the same as Wayne Martin."

**Mr. Fliedner**: "In your expert opinion and to a reasonable degree of scientific certainty, is it Wayne Martin's DNA found on ***the subject ski cap in this case, the knit hat***?"

**Mr. Kamnik**: "Yes."[7]

---

[5] G.J.M.: 14:21-15:23 (Emphasis added)
[6] G.J.M.: 16:11-13
[7] G.J.M.: 19:4-23 (Emphasis added)

36. Clearly, any purported DNA match to Mr. Martin came from the "knit hat" supposedly found on the sidewalk by Officer Connolly—which, again, documentary evidence conclusively shows could not have been recovered from the location claimed by Connolly. This, despite Gasser's earlier report having alleged a link between Mr. Martin and the ski mask.

37. Equally clear, however, is that Mr. Fliedner cleverly selected his words in order to blur the important distinction between the "ski-mask"—which was accounted for and processed appropriately—and the "knit hat"—which lacked any serious evidentiary value given its absence from the scene until several hours after the shootings.

38. Throughout Mr. Kamnik's testimony, it is apparent that the grand jury was led to believe that the "knit hat" allegedly recovered by Officer Connolly was the only item of evidence associated with voucher number M981642.

39. Even more disturbing is that prior to Mr. Kamnik's testimony, Mr. Fliedner set the stage for this deception during his questioning of the lone eyewitness to appear before the grand jury, Michael Walker. Mr. Walker testified that he had observed two individuals on the sidewalk in front of Gary's Tire Emporium prior to the shootings—one of whom later barged into the shop with a gun and, according to Walker, shot Gary Turner, Donald Turner and, presumably, Ricardo Davids.

40. In his testimony before the grand jury, Walker described the intruder as having worn a dark bubble jacket and a "knitted hat."[8] Mr. Walker was questioned specifically about the intruder's hat during the following exchange with Mr. Fliedner:

**Mr. Fliedner**: "Did you see whether the guy who did the shooting had his hat on when he walked in the office?"
**Mr. Walker**: "Yes."

---

[8] G.J.M.: 11:20-25

**Mr. Fliedner**: "And, did you see whether - - did you see anything about the hat after that?"
**Mr. Walker**: "Yes, he dropped the hat. The hat fell."
**Mr. Fliedner**: "Did you see it after that?"
**Mr. Walker**: "Yes."
**Mr. Fliedner**: "Where?"
**Mr. Walker**: "On the floor."[9]

41. After hearing this testimony from the only eyewitness presented to them, it is obvious that the members of the grand jury were intentionally misled by Mr. Fliedner's subsequent questioning of Mr. Kamnik. The testimony elicited from Michael Walker implied that the shooter—who by this time Walker had alleged to be Mr. Martin—dropped a hat as he fled the scene. Given both Walker's identification of the Mr. Martin from a purportedly reliable police lineup and his earlier testimony regarding the "knitted hat" he claimed was worn by the shooter, the clear implication was that the hat later referenced by Fliedner and Kamnik as having tested positive for Mr. Martin's DNA was the same one Walker had personally claimed to have seen the shooter drop—which we now know is patently false.[10]

42. "[O]ur state constitution guarantees that 'no person shall be held to answer for a capital or otherwise infamous crime…unless on indictment of a grand jury.' It is reasonable to infer that implicit in this constitutional guarantee is the right to an indictment predicated on truthful (reliable evidence)." *People v. Llewelyn*, 136 Misc.2d 525, 536 (1987).

43. There are, however, multiple instances of clear deception **and, in fact, perjury** throughout Detective Kevin Gasser's testimony in the grand jury proceedings. First, Detective Gasser misrepresented the amount of contact he had been able to make with Donald Turner Jr. in the interim between the crime and the grand jury proceedings.

---

[9] G.J.M.: 22:1-10
[10] Note that, at trial, Michael Walker retracted his claims regarding having seen the shooter drop a hat and, when confronted with his inconsistent testimony before the grand jury, testified as follows: "Well, I could tell you I did not see it fall off his head and hit the floor, but since the hat was there, the hat wasn't there when I was coming in, and *a similar hat was on his head as the one I picked up off the middle of the floor* and turned it over to the detective." T.T.: 86:17-21 (Emphasis added).

44. A short time after the shootings at Gary's Tire Emporium on November 27, 2005, Donald
    Turner Jr. suffered an aneurysm. As a result, there was reportedly some question regarding
    Turner's ability to assist with the investigation and/or to identify a perpetrator. Detective
    Gasser testified as follows regarding his claimed inability to communicate with Turner:

> **Mr. Fliedner**: "Was there a point in time when you were advised that there was some
> medical condition that had developed with regard to the young Donald Turner?"
> **Det. Gasser**: "Yes. In December, I believe it was the 16th of same year [sic], 2005, he
> suffered a brain aneurism [sic]."
> **Mr. Fliedner**: "What was your understanding of his hospitalization thereafter?"
> **Det. Gasser**: "He was again transported back to the hospital, I believe it was Kings County.
> Then he stayed at Kings County and several other hospitals for several months."
> **Mr. Fliedner**: "And, thereafter from the time of the incident through this subsequent medical
> treatment, were you able to communicate with the young Donald Turner about the incident?"
> **Det. Gasser**: "*I was not able to communicate with him, no.*"
> **Mr. Fliedner**: "Is it fair to say he was nonverbal or noncommunicative [sic] with regard to
> the information about what had happened?"
> **Det. Gasser**: "No. Non-verbal, yes."
> **Mr. Fliedner**: "To your knowledge, he has survived and he is alive at this point in time,
> correct?"
> **Det. Gasser**: "Yes."[11]

45. However, police reports make clear that Detective Gasser was well aware of Donald Turner's
    condition and, moreover, had in fact been able to communicate with him—as had a number
    of other investigators.

46. A follow up report by Detective Ambrosi of the Brooklyn South Homicide Squad establishes
    that Donald Turner was able to provide an account of the crime as well as a description of the
    perpetrator(s) as early as 6:35 P.M. on November 27, 2005—a little over an hour after the
    shootings at Gary's Tire Emporium.[12]

---

[11] G.J.M.: 11:2-24 (Emphasis added)
[12] See Exhibit 7: Complaint Follow-Up Informational Report re: "Interview of Donald Turner M/B 17," completed
by Detective Ambrosi of the Brooklyn South Homicide Squad and dated 11/27/05

47. A report from the following day by Detective Gasser establishes that he made contact with Donald Turner Jr. while the latter was recovering at Kings County Hospital.[13] Although the report states that Turner was in too much pain to speak with Gasser at that time, it also explains that Gasser left his card with Turner and informed him that he would return the following day.

48. Another report by Gasser establishes that he made good on his promise to return the following day and that, during that visit on November 29, 2005—only two days after the shootings at Gary's Tire Emporium—Donald Turner provided Gasser with a thoroughly detailed account of the crime and the perpetrator(s) involved. Moreover, according to the report, when Gasser inquired as to whether Turner would be able to make an identification if he saw the individual(s) again—Turner replied in the affirmative.[14]

49. While it is true that Donald Turner suffered an apparent aneurysm after the aforementioned report, subsequent reports make clear that Turner's health problems did not prohibit further contact with Detective Gasser.

50. In fact, by September of 2006, Donald Turner had recovered sufficiently that he was studying at Medgar Evers College. Furthermore, at trial, Donald Turner Jr. testified that he had personally reached out to Detective Gasser to express his interest in the status of the case and his ability to assist.[15]

51. A report by Detective Gasser dated September 29, 2006—which recounts a meeting between Donald Turner, Detective Gasser and Detective Mike Hopkins—establishes that Gasser and Hopkins were not only able to speak with Donald Turner, but also that when Gasser again

---

[13] See Exhibit 8: Complaint Follow-Up Informational Report re: "Attempt to interview Donald Turner (baby)," completed by Detective Kevin Gasser of the 067 Squad and dated 11/28/05
[14] See Exhibit 9: Complaint Follow-Up Informational Report re: "Interview of Donald "Baby" Turner," completed by Detective Kevin Gasser of the 067 Squad and dated 11/29/05
[15] T.T.: 380:7-10

inquired as to whether Turner recalled the night of the shootings and whether he would be able to identify the individual(s) who shot him—Turner again answered in the affirmative.[16]

52. It is patently obvious that Detective Gasser perjured himself before the grand jury regarding his ability to communicate with Donald Turner Jr. As a result, Gasser falsely led the grand jury to believe that a crucial eyewitness to—and victim of—the crime then under investigation, was both unavailable to them and more seriously injured than he actually was. This, after Detective Gasser's inexplicable failure to call Donald Turner Jr.—an available eyewitness who had expressed his willingness to cooperate—to view the lineup conducted on February 11, 2008.

53. Further deception by Detective Gasser is evident in his grand jury testimony regarding the number of individuals involved and potential suspects that had come to his attention since the shootings at Gary's Tire Emporium on November 27, 2005. Gasser was questioned on this subject by Mr. Fliedner and testified as follows:

> **Mr. Fliedner**: "Now, subsequent to November 27th, 2005, did you continue to investigate this matter and ultimately develop ***a person*** *of interest* with regard to this particular shooting?"
> **Det. Gasser**: "Yes."
> **Mr. Fliedner**: "And that *person's* name was what?"
> **Det. Gasser**: "Mr. Wayne Martin."[17]

54. Not only is Detective Gasser's testimony clearly misleading in light of the numerous references to multiple perpetrators throughout the police reports pertaining to this crime— and in fact, the numerous suspects already identified at that time—it also omits that Gasser and other investigators had in fact developed clear leads concerning several potential perpetrators.

---

[16] See Exhibit 10: Complaint Follow-Up Informational Report re: "Conversation with Winsome Turner," completed by Detective Kevin Gasser of the 67th Precinct and dated 9/29/06
[17] G.J.M.: 14:3-9 (Emphasis added)

55. As previously discussed, Jeffrey Joseph was considered the prime suspect in the shootings at Gary's Tire Emporium on November 27, 2005, as early as that very evening. Detective Gasser—who was also involved in the investigation into the shooting of Jeffrey Joseph—was undoubtedly aware of Michael Walker's identification of both Joseph and, subsequently, Joseph's clothing. This makes all the more inexcusable the fact that—in composing a later police lineup to be viewed by Michael Walker—Gasser nevertheless included Jeffrey Joseph in the lineup and, indeed, sat Joseph directly next to Mr. Martin.

56. Detective Gasser also neglected to inform the grand jury that he had been provided strong indications that Kimarley "Kim" Turner—the son of Gary Turner and brother of Donald Turner Jr.—may very well have been involved in the shootings of his father, brother and Ricardo Davids. Rather, it is apparent that Gasser led the grand jury to believe that his lengthy investigation had turned up a single "person of interest," Mr. Martin.

57. The initial source of the information regarding Kimarley Turner's potential involvement in the shootings was none other than Winsome Turner—the widow of Gary Turner. In fact, a report by Detective Gasser detailing his interview of Winsome Turner on the day after the murder of her husband clearly establishes that Winsome had strong concerns early on—which she communicated to Detective Gasser—about Kimarley's potential involvement in the crime.

58. Gasser's report recounts the following with regard to Winsome Turner's reaction to Detective Gasser asking "if she had heard who had done this or had a feeling who might be responsible":

> "…Winsome became very upset and then she began to tell me that Gary's oldest son Kimarley and him have been arguing lately. She said that they never really were close since Kimarley came from Jamacia [sic]. She said *about 3 weeks ago* she received a telephone call from Sloman Shields the alarm company for her house [redacted] Bklyn

21

[sic]. She called Gary to go over to the house and see what was going on. She said that Gary called her and said that the house was open but it seems nothing was missing so he locked it back up. Gary then received a phone call about a week later from a friend who said that Kimarley broke into the house. Winsome said that Gary called his sister Millie in Jamacia [sic] and told her what was going on and that Kimarley is very disrespectful. She said that Millie must have then spoke [sic] with Kimarley about it and Kimarley then called his father Gary and told him *you will get yours.*"[18]

59. Subsequent reports by Detective Gasser indicate that he followed up on this lead and received even more information tending to implicate Kimarley Turner. Specifically, a report dated November 30, 2005, memorializing a conversation between Gasser and Ava Welch—the former wife of Gary Turner—provided that Kimarley maintained contact with the two sons Welch shared with Gary Turner, Akeem and Raymond. Furthermore, according to Welch, "[Kimarley] had called the night Gary got shot and asked if Akeem or Ray were at they [sic] shop. She told him no and then she said that he asked to speak with Akeem. She said that she gave Akeem the phone but did not hear the conversation."[19]

60. On December 4, 2005, Detective Gasser followed up on the information provided by Ava Welch in a meeting with Winsome Turner and Akeem Tillett at the 67th Precinct. According to Detective Gasser's own report memorializing the meeting, Tillett—who had previously worked alongside his brothers (Donald Jr. and Kimarley) and father at Gary's Tire Emporium—provided Gasser with further alarming information concerning Kimarley Turner. In pertinent part, Gasser's report reads as follows:

"…Akeem said that Gary and Kim would always fight and Kim told him that *he thinks Gary wants to kill him*. Akeem said that Kim would always talk negative about Gary and he was mad at him because Gary would not give him his social security card or passport. Akeem said that *approx. 3 weeks ago* Kim called and asked if he knew anyone with a lock cutter and a van. He then *asks if the shops security camera works*. Akeem said that on the night Gary

---

[18] See Exhibit 11: Complaint Follow-Up Informational Report re: "Interview of Winsome Turner (wife of Donald "Gary" Turner)," completed by Detective Kevin Gasser of the 67th Precinct and dated 11/28/05 (Emphasis added)
[19] See Exhibit 12: Complaint Follow-Up Informational Report re: "Conversation with Ava Welch," completed by Detective Kevin Gasser of the 67th Precinct and dated 11/30/05

was shot Kim called and asked if I was ok and then said you heard what happened to daddy. *Kim then said that big doofy kid is dead too*. Kim then said I will call you later and hung up the phone…"[20]

61. A separate report completed by Detective Mike Hopkins on the same date establishes that Hopkins ran computer checks on Kimarley Turner in furtherance of the continuing investigation into the shootings at Gary's Tire Emporium on November 27, 2005.[21]

62. It is important to recognize that Detective Gasser's failure was not merely in neglecting to mention these clear indications that Kimarley Turner had been involved in the shootings at Gary's Tire Emporium to the grand jury—but rather, in the combination of that neglect with his false representation to the grand jury that Mr. Martin had been the sole suspect brought to his attention. In addition, curiously omitted from Detective Gasser's DD-5 memorializing his conversation with Akeem Tillett, was a notation from Gasser's log book which read, "Akeem asks Kim what time did this happen—*Kim says 4:30 P.M.*" Another notation in Gasser's log book, read simply "Kim—set it up."[22]

63. Thus, it is readily apparent that—contrary to Detective Gasser's representations during his testimony before the grand jury—Mr. Martin was not the only suspect to have come to his attention in the time between the shootings at Gary's Tire Emporium on November 27, 2005, and the date on which the grand jury was convened—July, 17, 2008.

64. Indeed, Mr. Martin was not even the only individual to have been identified by Michael Walker—the only eyewitness to appear before the grand jury. In addition to the leads pertaining to Kimarley Turner, both Jeffrey Joseph and Allan Cameron had been identified as

---

[20] See Exhibit 13: Complaint Follow-Up Informational Report re: "Conversation with Akeem Tillett," completed by Detective Kevin Gasser of the 67th Precinct and dated 12/04/05 (Emphasis added); Note that the time (3 weeks earlier) at which Akeem claimed Kimarley had asked him about a van and a lock cutter would coincide with the time at which Winsome stated the Turner house has been burglarized—allegedly by Kimarley.
[21] See Exhibit 14: Complaint Follow-Up Informational Report re: "Computer Checks On Kimarley A Turner," completed by Detective Mike Hopkins of the Brooklyn South Homicide Squad and dated 12/05/05
[22] See Exhibit 15: Selected pages from Detective Kevin Gasser's Log Book beginning 11/27/05

perpetrators by independent witnesses prior to Detective Gasser's testimony before the grand jury.

65. Gasser's failure to acknowledge the identification of the alternate suspects that had been brought to his attention no doubt misled the grand jury and impaired the integrity of their ultimate determination.

## II.    Police, Detectives and the Assistant District Attorney Coerced, Fabricated, and Concealed Critical Exculpatory Evidence to the Grand Jury, Plaintiff's Defense Counsel, and the Trial Jury Which, if Disclosed, Would Have Materially Influenced the Jurors and Caused Them to Change Their Ultimate Determination.

66. Of additional concern with regard to Michael Walker's appearance before the grand jury was his testimony pertaining to the lineup procedure he had participated in on February 11, 2008. Immediately after being questioned about his alleged observations concerning the shooter's hat, Michael Walker was questioned by Mr. Fliedner regarding the lineup procedure, and testified as follows:

> **Mr. Fliedner**: "Did you see anybody in that line-up that you recognized?"
> **Mr. Walker**: "Yes."
> **Mr. Fliedner**: "What was that - - was that *person* holding anything when you saw him?"
> **Mr. Walker**: "A number."
> **Mr. Fliedner**: "What was the number he was holding?"
> **Mr. Walker**: "Two."
> **Mr. Fliedner**: "How did you recognize him?"
> **Mr. Walker**: "He came in and shot."[23]

67. Of course, the grand jury was not apprised of the critical fact that Michael Walker had previously identified a different individual as the shooter within an hour of the crime—and then reinforced that identification by identifying the same individual's clothing directly

---

[23] G.J.M.: 23:1-10 (Emphasis added)

thereafter, much less that the individual in question—Jeffrey Joseph—was also present in the very same lineup. While Mr. Martin occupied spot number 2, Jeffrey Joseph was seated directly next to him in spot number 1.

68. It is important to note that at the time the lineup was held, Mr. Martin was 6'6" and weighed 225 lbs., whereas Jeffrey Joseph was 5'10" and 180 lbs. Clearly, Joseph was not chosen to participate because of his resemblance to Mr. Martin. Moreover, the lineup procedure was conducted by Detective Kevin Gasser—who was keenly aware of Jeffrey Joseph's reported link to the crime in question.[24]

69. Previously withheld evidence establishes that Michael Walker positively identified Jeffrey Joseph as the perpetrator almost immediately after the shootings. Indeed, according to a report prepared by the Patrol Supervisor at the 67th Precinct on the date of the crime, Jeffrey Joseph was initially considered the perpetrator of the shootings at Gary's Tire Emporium. Joseph had been shot in close proximity to the scene and—according to police reports—only minutes after the shootings at Gary's Tire Emporium:

"Possible witness [sic] at both scenes were interviewed and after further investigation, it appears that Mr. Joseph entered 262 East 96th street and attempted to commit a commercial robbery at the location. Mr. Joseph displayed a firearm and shot both Gary and Donald Turner inside the location. He then exited the location and shot an unknown male. Mr. Joseph in an unknown manner did flee to the corner of East 94th Street and Willmohr [sic] Street. It was at this location that witnesses did observe an unknown male shoot Mr. Joseph several times."[25]

70. The report establishes that Joseph was transported to Brookdale Hospital, where he was "positively identified" by an unnamed witness from Gary's Tire Emporium in a "show up" identification procedure.

---

[24] See Exhibit 16: Line-Up Report by Detective Kevin Gasser dated 2/11/08 and corresponding photographs
[25] See Exhibit 17: Report of "Four Males Shot, Two D.O.A., Two Not Likely, No Arrests Made, Within The Confines Of The 067 Precinct," from Patrol Supervisor, 067 Precinct-to Chief of Patrol, dated November 27, 2005

71. The previously withheld *Brady* material recently disclosed by the Office of the District Attorney establishes that this unnamed witness was in fact Michael Walker.[26]

72. In conjunction with other related reports, it further establishes that at 6:00 P.M.—less than an hour after the shootings at Gary's Tire Emporium, and only ten (10) minutes after he had identified Jeffrey Joseph in person—Michael Walker was transported to the scene where Joseph had reportedly been shot. There, Walker viewed Joseph's "black bubble jacket," which had been left at the scene by EMT's who had treated Joseph. Michael Walker then confirmed that Jeffrey Joseph's jacket appeared to be the same one he had seen the shooter wearing at Gary's Tire Emporium earlier that same evening.

73. Michael Walker's positive identification of Jeffrey Joseph on the evening of the crime was not, however, the only information pertaining to a likely alternate perpetrator concealed from the grand jury by Detective Gasser and the People.

74. Additional *Brady* material turned over by the Office of the District Attorney simultaneous with the information regarding Jeffrey Joseph establishes that Michael Belgrove—another eyewitness—identified Allan Cameron as having perpetrated the shootings at Gary's Tire Emporium on November 27, 2005.

75. Specifically, a report made out on December 8, 2005, by Detective John McGurran of the 67th Precinct establishes that on that date, "a male by the name of Michael Belgrove [was] under arrest at the 73 precinct and that Michael Belgrove was stating that he was a witness to the murder at Gary's Tire Shop on East 96 Street."[27]

---

[26] See Exhibit 18: Irregular Homicide Report provided to the defense by the Kings County District Attorney's Office
[27] See Exhibit 19: Complaint Follow-Up Informational Report re: "Interview [of] Michael Belgrove," completed by Detective John McGurran of the 67th Precinct and dated 12/08/05

76. According to the report, Belgrove informed police that he had been parked across from Gary's Tire Emporium when he saw a "dark color Q45 [Infiniti]" park near the shop and watched the driver exit and walk past his vehicle and into the shop. According to Belgrove:

"[A]bout a minute or so later he heard gunshots and turned to see what was happening. He said that at first he did not see who was shooting or where the shots were coming from but then he saw that male who had been driving the Q45, backing out of Gary's Tire shop and this male had a gun and was shooting into the shop. He said that this male was walking toward where he had parked the Q45 and was still firing toward the shop and that he saw a big guy who changes tires for Gary grab his head and duck down on the sidewalk. The male who was firing the gun then ran and got back into the Q45 and drove off, south on Kings Highway."

Upon arriving home, Michael Belgrove apparently informed his brother, George, of what he had seen. According to Belgrove:

"[S]ometime late that night or early morning, he [was] not sure, his brother, George, called him and told him that a cop had been shot in Flatbush. He said that he was watching the T.V. with his brother when he saw the cops with the guy who had shot the cop and he stated that he told his brother, George, at that time that that is the same guy he saw drive up in the Q45 and the guy that killed Gary."

77. A notation in Detective Mike Hopkins' log book for the instant matter makes clear that investigators were aware of Michael Belgrove's statement to police. Indeed, the notation even references Belgrove's brother George.[28]

78. In addition, the murder of Officer Stewart was a highly publicized crime with a noteworthy impact on police procedure and safety in New York.[29] As such, it is inconceivable that Detectives Gasser or Hopkins would have failed to recognize the significance of Cameron's potential involvement in the crime they were investigating—or been unaware of how well the

---

[28] See Exhibit 20: Selected pages from Detective Mike Hopkins' log book for the instant matter
[29] See Exhibit 21: Michael Brick, "Brooklyn Man is Convicted of Murder in Officer's Shooting," The New York Times (10/12/07)—"the case led the city to spend $12 million on new bullet-resistant vests that would provide more coverage of the neck and the sides of the torso. In Albany, lawmakers passed new laws increasing the penalties for weapons possession and crimes against police officers."

specifics of the shooting of Officer Stewart and those of Michael Belgrove's eyewitness account fit together.

79. That is, Allan Cameron was driving a dark colored Q45 Infiniti in the early morning hours of November 28, 2005, when he fatally shot Officer Stewart with a 9MM pistol—the same caliber weapon used by at least one assailant at Gary's Tire Emporium several hours earlier.[30] Had this information been relayed to the jury, it would have clearly called into question the tenuous link(s) to Mr. Martin.

### III.   The deceptive actions of the police officers, detectives and prosecutor directly affected the outcome of the grand jury and trial verdict.

80. There can be no doubt that the failure of the police and prosecutor in this case to reveal crucial information in a timely fashion or even at all, severely prejudiced Mr. Martin.

81. Three eyewitnesses—Michael Belgrove, Donald Turner Jr., and Michael Walker—were available at the time Detective Gasser conducted the lineup on February 11, 2008. Not only did Detective Gasser elect to have only one of these witnesses—Michael Walker—view the lineup, he placed an individual previously identified by Walker as the shooter in the lineup, directly next to Mr. Martin, and failed to reveal either the prior identification or the presence of that individual when testifying before the grand jury and at trial regarding the lineup.

82. Mr. Martin was prejudiced both by the failure to disclose these circumstances, and the resulting inability to cross-examine Michael Walker concerning the inconsistency of his identifications.

---

[30] See Exhibit 22: Al Baker, "Officer is Killed After Pulling Up Next to Gunman," New York Daily News, (11/29/05)—Allan Cameron was reportedly  driving "a maroon 1990 Infiniti Q-45 sedan."; See also Exhibit 23: Scott Shifrel, "Thug Goes on Trial for 2005 Cop Shooting," New York Daily News, (9/16/07).

83. In addition, because Walker was the only individual to view the lineup—and there can be no innocent explanation for Joseph's inclusion *as a filler* in a lineup composed for Mr. Martin—there is no realistic manner by which the taint of this procedure could have been effectively remedied.

84. In sum, Michael Walker made his freshest and most reliable identification within an hour of the crime—when he identified Jeffrey Joseph as the shooter from Gary's Tire Emporium and confirmed that identification in a subsequent procedure involving Joseph's jacket immediately thereafter. Investigators chose to ignore and suppress that critical evidence and instead call Michael Walker, and only Michael Walker, to view the lineup containing Mr. Martin 2 years, 2 months and 15 days later.

85. Michael Walker's identification of Mr. Martin cannot be realistically relied upon both because Mr. Martin and Jeffrey Joseph were clearly disparate in appearance and because Walker had previously identified Joseph as the shooter.

86. However, Walker's identification of Mr. Martin was clearly a substantial basis for the grand jury's ultimate determination—as it was the only eyewitness account or identification evidence presented during the proceedings.

87. Likewise, the grand jury was convened in large part on the basis of representations by Detective Gasser that Mr. Martin could be conclusively linked to a purportedly reliable item of evidence—the "ski mask."

88. However, it is now well established that if Mr. Martin was in fact linked to the crime scene at all—it was through the "knit hat"—the probative value of which is dubious at best given the circumstances surrounding its alleged discovery.

89. Indeed, the "ski mask" recovered from the interior of the scene—the presence of which, unlike the "knit hat," was consistently documented—has never been linked to anyone, much less Mr. Martin.

90. Mr. Martin has consistently maintained his innocence in this crime. There is no longer a shred of truly reliable or credible evidence to incriminate Mr. Martin. Rather, all of the evidence which purportedly linked Mr. Martin to the shootings was always or is now subject to significant question with regard to its probative value. Even the first link to Mr. Martin— allegedly through a match between his DNA and the "ski mask" by Detective Gasser—was based on a falsification.

91. Moreover, the evidence—both old and newly disclosed—establishes that within two weeks of the crimes, two different individuals, Jeffrey Joseph and Allan Cameron, were identified by independent eyewitnesses as perpetrators of the shootings at Gary's Tire Emporium on November 27, 2005.

92. Because of exceptionally serious misconduct by law enforcement personnel, the information regarding Jeffrey Joseph and Allan Cameron was not appropriately investigated or documented—nor was it presented to the grand jury that returned the indictment or to the trial jury that returned the verdict.

93. In the time since the shootings at Gary's Tire Emporium on November 27, 2005, Jeffrey Joseph has been convicted and incarcerated for his involvement in at least one additional murder—and is suspected of others—and Allan Cameron has been convicted and incarcerated for the murder of a police officer.

94. The misconduct during the investigation and trial stages of Mr. Martin's case has resulted in the conviction and indictment being vacated. The "evidence" used against Mr. Martin in the

manner it was manipulated and presented permeated the grand jury proceedings as well as the trial — rendering his conviction unreliable and unjust.

95. The investigation was delayed from its inception. That is, Mr. Martin was not indicted for well over two years from the date of the crimes charged. Likewise, Mr. Martin's trial did not commence until nearly five years from the date of the crimes for which he was charged. The flaws in Mr. Martin's trial and since-vacated conviction, as well as the mismanagement of the investigation into the shootings at Gary's Tire Emporium, are attributable to the law enforcement personnel involved and the representatives of the People at the Grand Jury and trial. It was only recently that these facts came to light through the cooperative efforts with the Conviction Review Unit.

## DAMAGES

96. Mr. Martin has five children ranging from 9 to 18 years of age—all of whom have been deprived of their father's presence as a result of his incarceration on the basis of his wrongful conviction.

97. Mr. Martin has steadfastly maintained his innocence with unwavering resolve. He is an intelligent and motivated individual, as evidenced by the great deal of effort he personally contributed to proving his claims of innocence.

98. As a result of his unjust conviction and imprisonment, Mr. Martin has suffered tremendously and incurred substantial damages.

99. Mr. Martin has suffered the indignity and deprivation of incarceration for over eight years in jail and maximum security prisons, including time in solitary confinement, for a crime he did not commit.

100. Mr. Martin was deprived of his relationships, and was prevented from raising and enjoying

his five children.

101. Mr. Martin suffered from mental anxiety and depression as a result of being incarcerated for a crime he did not commit, and continues to feel the effects of his unjust incarceration. He was physically and emotionally deprived of his freedom while an innocent man, a reality that produced an indelible impact of his outlook on life and his emotional well-being.

102. The injuries and damages sustained by the unjust conviction and imprisonment of Mr. Martin include, but are not limited to: personal injuries; physical injuries; emotional distress and depression; loss of income and impairment of future earnings capacity; humiliation, indignity and embarrassment; degradation and damage to reputation; restriction of personal freedom and the indignity and deprivation of state prison incarceration for over eight years; loss of enjoyment of life; loss of and/or impairment of relationships with his significant others, family and friends; and permanent consequences to Mr. Martin's emotional and mental well-being as well as lack of financial security.


## CAUSES OF ACTION

103. With respect to each cause of action, plaintiff MICHAEL REID a.k.a. WAYNE MARTIN incorporates by reference each paragraph of this complaint.


## FEDERAL CLAIMS

### Count 1:

### 42 U.S.C. §1983 Malicious Prosecution in Violation of The Fourth and Fourteenth Amendments

104. Defendants Gasser, Braithwaite, Hopkins, Connolly, Fliedner and John Doe police officers acting deliberately and with malice, initiated and took steps to continue the criminal

prosecution of Mr. Martin, without probable cause or other legal justification, by fabricating evidence and coercing false testimony from witnesses, by refusing to investigate other leads, and in reckless disregard of favorable evidence identifying other individuals and disproving Mr. Martin's guilt.

105. There was no probable cause to arrest or prosecute Mr. Martin given the revelations by the District Attorney's office, and given the fact that the only hat implicating Mr. Martin was taken from another location and "planted" at the scene of the crime.

106. The prosecution ultimately terminated in Mr. Martin's favor, when his conviction was vacated and the indictments against him were dismissed.

107. The actions of the defendants Gasser, Brathwaite, Hopkins, Connolly, Fliedner and John Doe police officers resulted in the unlawful prolonged detention of Mr. Martin and constituted a conscience-shocking failure to properly investigate and prosecute the real criminals in the murders.

108. The actions of the defendants Gasser, Brathwaite, Hopkins, Connolly, Fliedner and John Doe police officers violated Mr. Martin's clearly established rights under the Fourth and Fourteenth Amendments, and caused his wrongful conviction, nearly 10 years of imprisonment and all the ongoing injuries and damages set forth herein.

**Count 2:**

**42 U.S.C. § 1983 Fabrication of Evidence
in Violation of the Fourth and Fourteenth Amendments**

109. Defendants Gasser, Braithwaite, Hopkins, Connolly, and John Doe police officers deliberately fabricated evidence by feeding information to and coercing witnesses into false identifications after identifications had already been made, and then misrepresenting to

prosecutors in both DD5s, police reports, statement and in oral, pretrial communications that were consistent with their later perjurious testimony, that those details had originated with the witness(es).

110. In so doing they grossly overstated both the incriminating value and the reliability of the statements they attributed to the witness(es).

111. The hat that was eventually tied to Mr. Martin was found several blocks away and not at the crime scene – yet the individual defendants claimed and testified under oath that the hat was found immediately beside one of the murder victims.

112. Defendant Fliedner, in his investigative capacity, became aware of the fact that the fabricated identifications and evidence was necessary in order to indict and convict Mr. Martine and, despite knowledge of its false and purjurious nature, used the evidence to indict and convict Mr. Martin.

113. This fabrication of evidence violated Mr. Martin's clearly established Fourteenth Amendment rights to a fair trial and not to be deprived of liberty without due process of law.

114. As a direct and proximate result of the individual defendants' fabrications, and Defendant Fliedner holding them out to be true at the grand jury and at the trial, despite his knowledge to the contrary, Mr. Martin was wrongfully convicted and suffered the injuries and damages described above.

## Count 3:

### 42 U.S.C. § 1983 Failure to Properly Investigate
### in violation of the Fourth and Fourteenth Amendments

115. Notwithstanding the fact that the no physical or forensic evidence actually connected Mr.

Martin to the murders and that the witnesses immediately identified and described a different individual, defendants Gasser, Braithwaite, Hopkins, Connolly, Fliedner and John Doe police officers refused to acknowledge Mr. Martin's innocence or to investigate evidence demonstrating that two other individuals, both with extensive criminal histories and one now being a convicted cop-killer, committed these murders.

116. Defendants Gasser, Braithwaite, Hopkins, Connolly, and John Doe police officers lied to prosecutors and deliberately steered the investigation away from the real killers. Defendant Fliedner, despite knowledge of the false evidence, moved forward with Mr. Martin's prosecution.

117. This conscience-shocking failure to investigate obvious and known exculpatory leads deprived Mr. Martin of his liberty, in violation of the Fourth and Fourteenth Amendments.

### **Count 4**:

### **42 U.S.C. § 1983 Suppression of Favorable Evidence in Violation of the Fourteenth Amendment**

118. Defendants Gasser, Braithwaite, Hopkins, Connolly, Fliedner and John Doe police officers knowingly and deliberately chose not to document or disclose to prosecutors and/or defense counsel information that was favorable and material to Mr. Martin's defense, including, without limitation, the truth about where the hat actually came from, the fact that Mr. Martin was not the person who was initially identified, the fact that witnesses were coerced into picking Mr. Martin from a photo array and/or lineup to implicate him, and the fact that other suspects were known to defendants, who failed to follow up and investigate.

119. In withholding material exculpatory and impeachment information, they also deprived Mr.

Martin's defense team of it in violation of his clearly established Fourteenth Amendment right to a fair trial.

120. Defendants' suppressions caused Mr. Martin's wrongful conviction, as well as all the ongoing injuries and damages set forth above.

## Count 5:

### 42 U.S.C. § 1983 Civil Rights Conspiracy

121. Defendants Gasser, Braithwaite, Hopkins, Connolly, Fliedner and John Doe police officers, acting within the scope of their employment and under color of law, agreed among themselves and with others, to act in concert in order to deprive Mr. Martin of his clearly established Fourth, Fifth, Sixth, Eighth and/or Fourteenth Amendment rights, including the right to be free from malicious prosecution, the right not to be deprived of liberty without due process of law, and the right to a fair trial.

122. Overt acts in furtherance of this conspiracy to violate Mr. Martin's civil rights include all those acts described above, beginning on the first evening of the investigation.

123. The overt acts defendants Gasser, Braithwaite, Hopkins, Connolly, Fliedner and John Doe police officers took in furtherance of the conspiracy continued through trial and after Mr. Martin's conviction into post-conviction proceedings, with the refusal to investigate obvious leads, the suppression of exonerating and impeaching evidence, and the intimidation of known and unknown defense witnesses.

124. Defendants Gasser, Braithwaite, Hopkins, Connolly, Fliedner and John Doe police officers acted intentionally in a concerted effort to cover up official misconduct by the City of New York (NYPD) law enforcement officials and defendant Fliedner to ensure Mr.

Martin's continued unconstitutional imprisonment.

125.   As a direct and proximate result of this conspiracy to violate his constitutional rights, Mr. Martin was wrongly arrested, indicted, prosecuted and imprisoned, and suffered all the ongoing injuries and damages set forth above.

## Count 6:

**42 .S.C. § 1983 Supervisory Liability**

126.   Defendants John Does 1-5 or a partial number thereof were supervisory police officers, acting deliberately, recklessly and under color of law, were, at the relevant times, supervisory personnel with the City of New York NYPD with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of Gasser, Braithwaite, Hopkins, Connolly, and John Doe police officers defendants who deprived Mr. Martin of his clearly established constitutional rights.

127.   Defendants John Does 1-5 supervisors were personally involved in both the deprivation of Mr. Martin's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations.

128.   Defendants John Does 1-5 supervisors were reckless in their failure to supervise defendants Gasser, Braithwaite, Hopkins, Connolly, and John Doe police officers, and either knew or should have known that defendant officers were maliciously prosecuting civilians, deliberately failing to investigate evidence pointing to other leads or suspects, fabricating and coercing witnesses, suppressing exculpatory evidence, perjuring themselves as witnesses, and depriving civilians of due process of law.

129.   These supervisory defendants knew or in the exercise of due diligence would have known

that the conduct of the named and John Doe defendants against Mr. Martin was likely to occur.

130. The failure of these supervisory defendants to train, supervise and discipline the named individual defendants and John Does amounted to gross negligence, deliberate indifference or intentional misconduct, which directly caused the injuries and damages set forth above.

## Count 7:

### 42 U.S.C. § 1983 *Monell* Claim
### for Unconstitutional Custom or Policy And Failure to Supervise and Train

131. The City of New York, by and through its final policymakers, had in force and effect during the Martin investigation and for years beforehand, a policy, practice or custom of conducting constitutionally inadequate investigations; fabricating inculpatory evidence; perjury; failing to obtaining probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; suppressing from prosecutors material information favorable to criminal defendants; failing to follow the duties imposed by *Brady v. Maryland;* and using unconstitutional interrogation techniques.

132. The City of New York systemically failed to adequately to train its police officers, detectives and investigators to conduct constitutionally adequate investigations; not to lie about their conduct; to accurately document the manner in which interrogations were conducted when confessions were elicited; to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; to disclose to prosecutors material information favorable to criminal defendants; and to refrain from unconstitutional interrogation techniques and perjury.

133. The City of New York failed to adequately supervise its police officers, detectives and

investigators in conducting constitutionally adequate investigations; accurately documenting the manner in which interrogations were conducted when confessions were elicited so that confessions were not fabricated; obtaining probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclosing to prosecutors material information favorable to criminal defendants; testifying truthfully; and refraining from using unconstitutional interrogation techniques.  Officers knew that in this climate of lax supervision, they were free to deviate from constitutional requirements in these areas.

134. The City of New York, by and through its final policymakers, failed to adequately discipline their police officers for investigative wrongdoing, though it was foreseeable that constitutional violations of the type Mr. Martin suffered would be a predictable result of such failures.

135. As set forth herein, final policymakers for the City of New York had actual or constructive notice of such failures to train, supervise and discipline its employees, and failed to provide training or supervision despite an obvious for such training and supervision, where defendants knew that it was foreseeable that detectives, officers, and investigators would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result.

136. Such failures to train, supervise and discipline, and such unconstitutional municipal customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of criminal defendants like Mr. Martin, and were the moving force behind his false, coerced and fabricated investigation, causing his arrest, prosecution, and incarceration, as well as all the ongoing injuries and damages set forth above.

137. The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and NYPD, all under the supervision of ranking officers of the NYPD.

138. The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

139. At the time of the aforementioned constitutional violations, the City and NYPD were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such that the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part infra, the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made no meaningful attempt to prevent future constitutional violations.

140. The existence of aforesaid unconstitutional customs and policies may be inferred from **repeated occurrences of similar wrongful conduct**, as documented by the following civil

rights actions and parallel prosecutions of police officers:

a.   Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y)(police officer who exposed a precinct's polices and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);

b.   Long v. City of New York, 09-CV-6099 (AJK)(S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false complaint and is convicted of falsifying police records);

c.   Taylor-Mickens v. City of New York, 09-CV-7923 (RWS)(S.D.N.Y)(police officers at 24th precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint review Board against the precinct);

d.   Lin v. City of New York, 10-CV-1936 (PGG) (S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

e.   Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (in an Order dated November 29, 2009 denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issued were and prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

'Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated,

widespread falsification by arresting police officers of the New York City Police Department.   Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.'

f.   People v. Arbeedy, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators.   Seeing it so much, it's almost like you have no emotion with it.   The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it – being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics

enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. Bryant v. City of New York, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. Williams v. City of New York, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on premises);

i. MacNamara v. City of New York, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j. McMillan v. City of New York, 04-cv-3990 (FB)(RML) (E.D.N.Y.)(officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

k. Avent v. City of New York, 04-CV-2451 (CBA) (CL) (E.D.N.Y.)(same);

l. Smith v. City of New York, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m. Powers v. City of New York, 04-CV-2246 (NGG) (E.D.N.Y.)(police officer alleges unlawful retaliation by other police officers after testifying about

corruption in the NYPD);

n.  Nonneman  v. City of New York, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.)(former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

o.  Richardson v. City of New York, 02-CV-3651 (JG)(CLP) (E.D.N.Y.)(officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p.  Barry  v. City of New York, 01-CV-10627 (CBM) (S.D.N.Y.)(triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged the NYPD had an "unwritten but persuasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q.  White-Ruiz  v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y., 1997)(holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

r.  Ariza  v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis 20250 at 14(E.D.N.Y.)(police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had

established proof of both a widespread usage of policy to regulate against police officers who exposed police misconduct and a failure to train in the police department).

141. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

    a.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors.  Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[31]

> {…}

> What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world.  Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful.  As one dedicated officer put it, police officers often view

---

[31] Mollen Commision report, p.36

falsification as, to use his words, "doing God's work" – doing whatever it takes to get the suspected criminal off the streets.  This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that?  They're guilty."[32]

b. In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training Velasquez [officers] to falsify paperwork to sidestep legal safeguards."  Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions  "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[33]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel.  The suspect was released.[34]  Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served

---

[32] Mollen Commission Report, pp 40-41.
[33] Melissa Grace, *NYPD Sgt. William Eiseman Pleads Guilty to Lying Under Oath in Plea Deal*, Daily News, June 27, 2011, available at http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288
[34] Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009 available at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVogv4Ndeqcl.

them just as well.

That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.[35]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "planting drugs on suspects and stealing cash during gambling raids." The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the

---

[35] Id.

Assistant United States Attorney Monica Evans, members of the 109th Precinct

"maintained a small stash of drugs in an Altoids tin for this purpose."[36]

e.   In December 2009, two officers from the 81st Precinct in Brooklyn arrested and

falsely swore out charges against an undercover officer from Internal Affairs

Bureau.  As explained in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when
> they were told to keep an eye out for people selling untaxed cigarettes in
> their precinct.
>
> Sometime later, they saw a man hanging out on a corner in the
> neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him,
> but they claimed that they had seen him selling the bogus butts to two
> people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an
> undercover corruption investigator and that the whole incident was caught
> on video.
>
> To complete the ruse, the undercover cop was processed at the station
> house so as not to tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s]  from precinct commanders
> caving to the  pressure  of  top  brass  to  make themselves look better.
>
> "There's  pressure  on  the  cops  from  the  bosses  and  they're  getting

---

[36] John Marzulli, *Claims of Corruption in Queens Precinct Put precinct Crooked Cop's Sentencing on Hold*, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352.

pressured from headquarters," a police source told The Post.

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[37]

f.  In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean. Spence falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[38]

g.  Separate grand jury investigations into drug-related police corruption in the Bronx; and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand · jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct- are not isolated instances. They say the investigations reflect a larger, broader problem within the

---

[37] Id.
[38] John Marzulli, *Brooklyn cops charged with barging into sting operation, arresting a fellow officer*, N.Y. Daily News July 30, 2010, available at http://www.nydailynews.com/ny_loca1120l0/07/30/2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

NYPD that its top officials seem unable or unwilling to acknowledge.[39]

142. Furthermore, the existence of the aforesaid unconstitutional customs and policies, specifically with regard to "productivity goals," may be further inferred from the following:

    a.  Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[40]

    b.  An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[41]

    c.  NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses"

---

[40] Jim Hoffer NYPD Officer claims pressure to make arrests WABC·TV Eyewitness News, March 22010, available at http:J/abclocal.go.com/Wabc/story?section=news/investigators&id=730536 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[41] Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts but brass says there's no quotas,* N.Y. Daily News, March 3, 2011.

per month. P.O. Polanco's allegations were confirmed by an audiotape obtained

by the media. The contents of the tape reveal that these quotas are enforced

through coercion and threats of job loss; to wit, a patrol supervisor at the 41st

Precinct is overheard saying: "If you think one and 20 is breaking your balls,

guess what you'll be doing.  You're gong (sic) to be doing a lot more, a lot more

than what they're saying." The tape also reveals that another patrol supervisor

chimed in and told the officers: "next week, 25 and one, 35 and one, and until you

decide to quit this job and go to work at Pizza Hut, this is what you're going to be

doing till (sic) then."[42]

d.   The New York Daily News obtained and published two internal memos which

were posted inside the roll-call room at the NYPD's 77th Precinct.  The memos

specifically instructed officers about the "number of tickets to give drivers for cell

phone, seat belt, double-parking, bus stop, tinted windows and truck route

violations" that they were expected to issue. The memos remained posted for

several weeks inside the roll-call room until the media began inquiring. [43]

e.   Responding to a query from a civilian who was cited on consecutive days in

November of 2009 for allegedly occupying more than one seat on the New York

City subway, the officer responded: "Recently we've been told to write tickets

instead of give warnings for this type of thing." The officer explained that they

needed to meet quotas. [44]

---

[42] Id.
[43] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010.
[44] Tom Namako and Kirsten Fleming, *Nightime Riders in Big Sit Fit*, The  New York Post. December 26, 2009, available at http://www.nypost.com/p/news/11/space_hogs_lapped_on_empty_subways.

f.  In December of 2010 and in response to the pressure from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[45]

g.  In response to the planned summons-boycott at the 79th Precinct on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[46]

h.  Capt. Alex Perez, the second in command at the NYPD's 8151 Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[47] Ultimately, the jury in that case judged that the police and a policy "regarding the number of arrests officers were to make that violated plaintiffs constitutional rights and contributed to her arrest."[48]

---

[45] Rocco Parascandola, *Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, available at http://www.nydailynews.com/news/12_bklyn_cops_threaten_tixwriting_boycott.

[46] Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79'h Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15,2010, available at http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya_deputy.html.

[47] William J. Gorta, *Brooklyn Mom's Suit. Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15,.2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. l5, 2011, at 20, also available on Westlaw at 20 WLNR 2986205.

[48] Oren Yaniv, *Court rules that cops do use quotas; woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News. Feb. 19, 2011; available at http://www.nydailynews.com/news/ny_crime/201 J/02119/2011-02.

i.   The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violation citations; three "quality-of-life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[49]

j.   Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> 'You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News. Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to finagle the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint states.

---

[49] *New York City Ticket Quota Confirmed, Denied,* The Newspaper.Com, January 21, 2006, available at http://www.thenewspaper.com/news/09/914.asp; *see also,* Kirsten Cole. *NYPD's Bogus Little Secret: Parking ticket Quotas-Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html.

> Unbeknownst to Creighton, one officer had his NYPD radio switched on so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by the 911 dispatcher.[50]

143. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact** are further evidenced, inter alia, by the following:

144. With respect to Fourth Amendment violations, in Ligon v. City of New York, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[51] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

145. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the

---

[50] Allison Gendar *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, available at http://www.nydailynews.com/news/ny_crime/2007/11/14/214 _nypd_captain_allegedly_caught_in_arrest.
[51] Id. at *34.

bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[52]

146. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

147. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal

---

[52] Mollen Commission Report, pp. 2-3, available at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commissiono/%20-%20NYPD.pdf.

gain. It's more for convenience."[53]

148. In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condoning, and/or encouragement of unconstitutional policies, customs, and practices.[54]

149. Regarding defendant City's tacit condoning and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[55] When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during

---

[53] Loren Yaniv and John Marzuli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.

[54] Rocco Parascandola et al, *Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More Than $1.5 Million in Settlements*, N.Y. Daily News, May 19, 2013, available at http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.

[55] In 2006, out of more than 10.000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%). See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories inter alia sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[56]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by he NYPD rose to 66% in 2007.  Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[57]

150. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

    a.  In a suit filed in 2012, Officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.[58]

    b.  In Griffin v. City of New York, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker

---

[56] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009 at A19.

[57] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[58] Al Baker, *Bronx Police Precinct Accused of Using Quota System*, N.Y. Times, Feb. 24, 2012, available at http://www.nytimes.com/2012/02/24/nyregion/lawsuit-says-bronx-police-precinct-uses-quota-system.html?_r=0.

and faced other repercussions from fellow police officers that his supervisors failed to address.[59]

c.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

d.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the  "code of silence" in the NYPD;

e.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

151.  The existence of the above-described de facto unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including without limitation, Commissioner Kelly.

152.  The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all:

---

[59] Id at 389-92. See also Joseph Goldstein, Officers, Exhorted to Report Corruption, Still Fear Retaliation, N.Y. Times, June 25, 2012, available at http://www.nytimes.com/2012/06/25/nyregion/new-york-police-officers-face-retaliation-for-reporting-corruption.html?partner=rss&emc=rss&pagewanted=all.

(i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers  for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

153. All of the foregoing acts by defendants deprived Plaintiff of his federally protected rights, including, but limited to, the constitutional rights enumerated herein.

154. Defendant City knew or should have known that the acts alleged herein would deprive Plaintiff of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

155. Defendant City is directly liable and responsible for the acts of defendants Gasser, Braithwaite, Hopkins, Connolly, and John Doe police officers as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

156. Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs,

or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

157. The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, defendants Gasser, Braithwaite, Hopkins, Connolly, and John Doe police officers felt empowered to arrest Plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiff's constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report the individual defendants' violations of Plaintiff's rights.

158. Plaintiff's injuries were a direct and proximate result of the defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, train and discipline their police officers.

159. As a result of the foregoing, Plaintiff was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

## STATE-LAW  CLAIMS

## COUNT 8:

### Malicious  Prosecution

160. Defendants  Gasser,  Braithwaite,  Hopkins,  Connolly,  Fliedner  and  John  Doe  police  officers, lacking  probable  cause,  nonetheless  intentionally,  recklessly,  and  with  malice,  caused  Mr. Martin  to  be  arrested,  prosecuted,  and  convicted  of  murder.

161. Defendants  Gasser,  Braithwaite,  Hopkins,  Connolly,  Fliedner  and  John  Doe  police  officers were  in  part,  complaining  witnesses  whose  actions  initiated  or  commenced  the prosecution,  and  who  then  took  steps to ensure  that it  continued.

162. Furthermore,  the  defendant  officers  intentionally  falsified  evidence  and  coerced witnesses,  vitiating  probable  cause  against  Mr. Martin,  including  but  not limited to the fact that  no  other  suspect  was  ever  identified,  and  that  the  hat  linked  to  Mr. Martin  was found  at  the  scene  of  the  crime  when  it  was  not.   Defendant  Fliedner  continued  this falsification  during  his  investigation  when  he  learned  of  the  false  evidence  and  then proceeded  with  the  prosecution  of  Mr. Martin,  despite  glaring  exculpatory  evidence in  Mr. Martin's  favor.

163. As Mr. Martin  has maintained  for  nearly  10 years,  he  is  innocent  of  these  murders.

164. The  prosecution  finally  terminated  in  Mr. Martin s  favor  when  his  conviction  was  vacated and  the  charges  against  him  dismissed.

165. As  a  direct  and  proximate  result  of  defendants'  actions,  Mr. Martin  was  wrongly prosecuted,  convicted  and  imprisoned  for  nearly  ten  years,  and  suffered  other  grievous and  continuing  damages  and  injuries  set  forth  above.

## **Count 9:**

### **False Imprisonment**

166. Defendants Gasser, Braithwaite, Hopkins, Connolly, Fliedner and John Doe police officers intended to confine Mr. Martin, and, lacking probable cause or any other privilege, curtailed his liberty by arresting him and taking steps to ensure he was imprisoned on the basis of false evidence and without legal justification.

167. Mr. Martin was conscious of the confinement, and did not consent to it.

168. As a direct and proximate result of defendants' actions, Mr. Martin was wrongly arrested and falsely imprisoned from September 2, 2008, until he was finally released on September 7, 2016, and suffered the other grievous and continuing damages and injuries set forth above.

   **WHEREFORE,** Martin Martin prays as follows:

   a. That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

   b. That the Court award punitive damages to him, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

   c. For a trial by jury;

   d. For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

   e. For any and all other relief to which he may be entitled.

Dated: New York, New York
      September 7, 2017

Respectfully Submitted,

BY:    *Craig Phemister*
          _____
          CRAIG PHEMISTER, ESQ. (CP0288)
          Attorney for Plaintiff
          Napoli Shkolnik, PLLC
          360 Lexington Avenue – 11th Floor
          New York, NY 10017
          (212) 397-1000